STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 12-1288


MONTE MCWILLIAMS

VERSUS

EXXON MOBIL CORP., ET AL.


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2009-2803
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of John D. Saunders, Billy Howard Ezell, and Shannon J. Gremillion, Judges.

**AFFIRMED IN PART AS AMENDED; AND REVERSED IN PART.**


**Harry Alston Johnson, III**
**Phelps Dunbar**
**400 Convention St., Suite 1100**
**Baton Rouge, LA 70802**
**(225) 346-0285**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Texaco, Inc.**
    **Union Oil Company of California**

**Wells Talbot Watson**
**Baggett, McCall , Burgess, Watson & Gaughan**
**P. O. Drawer 7820**
**Lake Charles, LA 70606-7820**
**(337) 478-8888**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
   **Monte McWilliams**

**Terrence D. McCay**
**One Lakeshore Drive, Suite 1150**
**Lake Charles, LA 70629**
**(337) 430-0350**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
   **Texaco, Inc.**
   **Union Oil Company of California**
   **Chevron USA, Inc.**

**Robert Scott**
**Blank Rome, LLP**
**700 Louisiana, Suite 400**
**Houston, TX 77002**
**(713) 228-6607**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
   **Texaco, Inc.**
   **Union Oil Company of California**
   **Chevron USA, Inc.**

**Darren Lee Brown**
**Provost Umphrey Law Firm**
**490 Park St.**
**Beaumont, TX 77704**
**(409) 835-6000**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
   **Monte McWilliams**

**EZELL, Judge.**

Chevron U.S.A., Inc., Texaco, Inc., and Union Oil Company of California (hereinafter collectively referred to as "the Defendants") appeal two judgments of the trial court below. They appeal the trial court's interlocutory judgment striking of all their defenses for violations of La.Code Civ.P. art. 1471. They also appeal the jury award of $12,000,000.00 in punitive damages, prejudgment interest on future damages, and the award of $458,419.87 in past medical expenses in favor of the plaintiff, Monte McWilliams. For the following reasons, we hereby affirm the judgment in part, as amended, and reverse in part.

In this case, Mr. McWilliams alleges that he developed acute promyelocytic leukemia as a result of exposure to benzene while gauging barges during twenty-seven years as a petroleum inspector employed by numerous independent contractors. During five of those years, he worked on premises or vessels owned by the Defendants. None of the Defendants are domiciled in Louisiana, and all the work alleged to have led to Mr. McWilliams' cancer took place in Texas. In July 2009, Mr. McWilliams brought suit under maritime law and the Jones Act. His suit named thirty-five defendants, but only the Defendants remained in the case at the time of trial.

Throughout the course of this case, the Defendants were, at best, uncooperative in discovery. Mr. McWilliams sought depositions of corporate representatives under La.Code Civ.P. art. 1442 for six months while the Defendants refused to even respond to the requests. When Mr. McWilliams finally set the deposition dates unilaterally, the Defendants' response was to file a Motion for Protective Order to delay trial. On March 18, 2011, the trial court held a hearing on the motion and denied it, ordering the depositions be set within ten days. The trial court also noted the Defendants' behavior and warned them "if something like that happens again I'm not going to

have any sympathy whatsoever." By the deadline ten days later, all the depositions had still not been set. The trial court gave the Defendants until the next day to do so. The trial court ordered that all of the Article 1442 depositions had to be completed by May 16, 2011. The trial court further ordered that documents requested in the deposition notices be produced one week in advance of the depositions.

However, documents were often not produced one week before the depositions, as ordered, but instead were given a few days in advance. When documents were produced, they were produced without any identification or response to the specific subjects, but in mass document dumps, effectively making the production meaningless. The Article 1442 designees had not reviewed many of the documents and were not fully prepared to testify about them. The corporate representatives testified that they were not fully familiar with the deposition notices, did not bring subpoenaed responsive documents to the deposition, had not reviewed the responsive documents, and that many responsive documents existed that were not produced. As a result of this non-responsive discovery, Mr. McWilliams filed a motion to compel and sought sanctions against the Defendants.

At the June 30, 2011 hearing on the motion for sanctions, the trial court ruled that multiple orders had been in place regarding the depositions and documents to be produced. The trial court found the Defendants to be in bad faith violation of those orders, noting that the Defendants' actions had resulted in a continuance of the trial, prejudiced plaintiff, and caused a year of discovery to be lost. Further, the trial court ruled that restarting the discovery process would be unreasonable, impractical, and unduly burdensome to Mr. McWilliams. The trial court invoked La.Code Civ.P. art. 1471 and struck all defenses asserted by the Defendants, "leaving only the issue of damages."

After the June 30, 2011 hearing, the Defendants sought a writ application to this court on the judgment striking its defenses. In an unpublished opinion, we

2

unanimously denied the writ application, finding that there was "no abuse of discretion in the trial court's ruling." The Supreme Court also denied writs on the issue, upholding this court's determination. *McWilliams v. ExxonMobile Corp.*, 12-144 (La. 1/27/12), 79 So.3d 1017.

A jury trial begun on February 6, 2012 and the jury was charged that "the amount of damages is solely for you to determine." As a result, the Defendants were found liable for $5.5 million in actual damages and $12 million in punitive damages. From that decision, the Defendants appeal.

On appeal, the Defendants assert five assignments of error. They claim:

1.
The trial court abused its discretion in entering an interlocutory judgment ordering as a sanction for allegedly inadequate discovery responses that "the defenses of defendants be stricken under LCCP art. 1471, leaving only the issue of damages."

2.
The trial court erred in refusing to apply Texas substantive law to all issues not governed by federal maritime law.

3.
The trial court erred in numerous evidentiary rulings which it mistakenly thought were required by the striking of defendants' defenses, which resulted in: (a) excusing plaintiff from the obligation of presenting a prima facie case of causation and liability, and informing the jury that those issues had been "established"; (b) lack of evidence before the jury with respect to plaintiff's significantly shortened life expectancy, resulting in a grossly excessive compensatory damage award; and (c) lack of evidence before the jury with respect to comparative fault.

4.
The trial court's award of $12 million in punitive damages deprived the defendants of due process of law under the Fourteenth Amendment to the United States Constitution.

5.
The trial court's award of $12 million in punitive damages and $5,498,391.87 in compensatory damages is a violation of federal maritime law, which limits any award of punitive damages to a sum not in excess of compensatory damages awarded.

In an attempt to be as concise as possible, we will address these assignments of error slightly out of order.

3

## Sanctions

The Defendants first claim that the trial court erred in striking all of their defenses for failure to follow the trial court's orders regarding discovery. Louisiana Code of Civil Procedure Article 1471 sets out the sanctions available against a party failing to comply with discovery orders. The statute states:

> A. If a party or an officer, director, or managing agent of a party or a person designated under Article 1442 or 1448 to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under Article 1464 or Article 1469, the court in which the action is pending may make such orders in regard to the failure as are just, and among others any of the following:

> (1) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order.

> (2) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence.

> (3) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

> (4) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination.

> (5) Where a party has failed to comply with an order under Article 1464, requiring him to produce another for examination, such orders as are listed in Paragraphs (1), (2), and (3) of this Article, unless the party failing to comply shows that he is unable to produce such person for examination.

As noted in *Horton v. McCary*, 92-2315 (La. 4/22/92), 635 So.2d 199, 203 (alteration in original):

> There is a distinction between the sanctions available for failure to comply with discovery and the sanctions available for disobedience of court ordered discovery. *MTU of North America, Inc. v. Raven Marine, Inc.,* 475 So.2d 1063 (La.1985). Refusal to comply with court ordered discovery is a serious matter. *See Chilcutt v. U.S.,* 4 F.3d 1313 (5th Cir.1993). Trial judges must have severe sanctions available to deter

4

litigants from flouting discovery orders. *National Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). Note, *The Emerging Deterrence Orientation in the Imposition of Discovery Sanctions,* 91 Harvard L.Rev. 1033 (1978).

The Louisiana rule, like Federal Rule 37, allows the trial court to sanction a disobedient party with dismissal or a default judgment. Both dismissal and default are draconian penalties which should be applied only in extreme circumstances. *Barnhill v. U.S.,* 11 F.3d 1360 (7th Cir.1993); *Allen v. Smith,* 390 So.2d 1300 (La.1980). Because the sanctions of dismissal or default involve property rights, those sanctions are generally reserved for the most culpable conduct. *See Hovey v. Elliott,* 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897); *Hammond Packing Co. v. Arkansas,* 212 U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530 (1909); and *Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958).

Federal district courts consider four factors before granting a default judgment: (1) whether the violation was willful or resulted from inability to comply; (2) whether less drastic sanctions would be effective; (3) whether the violations prejudiced the opposing party's trial preparation; and (4) whether the client participated in the violation or simply misunderstood a court order or innocently hired a derelict attorney. *Batson v. Neal Spelce Associates, Inc.,* 765 F.2d 511 (5th Cir.1985); *U.S. for Use of M-CO Const. v. Shipco General,* 814 F.2d 1011 (5th Cir.1987).

Dismissal and default are generally reserved for those cases in which the client, as well as the attorney, is at fault. *Compare Allen v. Smith,* 390 So.2d 1300 (La.1980). The record must support "a finding that the failure was due to . . . willfulness [sic], bad faith, or fault." 390 So.2d at 1302.

The trial court has much discretion in imposing sanctions for failure to comply with discovery orders, and its ruling should not be reversed absent an abuse of discretion. *Lirette v. Babin Farm, Inc.,* 02-1402 (La.App. 1 Cir. 4/2/03), 843 So.2d 1141; *Garza v. Int'l. Maint. Corp.,* 97-317 (La.App. 3 Cir. 10/29/97), 702 So.2d 1021.

In this case, the trial court found the Defendants willfully violated orders it issued concerning the scheduling and taking of corporate depositions and the production of documents prior to those depositions. The trial court was incredibly thorough and descriptive in its condemnation of the Defendants' actions, stating:

[W]ith the exception of 80 to 90 boxes [of documents] that were provided[,] these other ones were not within the week that the court previously ordered. I mean[,] I had specifically said they need to be provided a week before. Those were not. All this information has been

5

known for almost a year as far as somebody was going to need to testify in this 1442 deposition and the parties or the defendants ignored all of the requests from [Mr. McWilliams' attorney] for several months and didn't bother doing anything in anticipation of a 1442 deposition even after the Court ordered dates to be given. They hadn't done anything until – didn't bother to try to look up these documents and prepare for their testimony and all that's important.

. . . .

And so I don't know that I want to use the word arrogance at this point, but I think it's appropriate. The arrogance of the defendants just to kind of ignore the discovery requests by counsel and to ignore this Court's order or just make some kind of superficial effort to comply with the Court's order is what I'm finding at this time, and that's what I do find. I find that there was no meaningful effort to comply with this Court's order. I have been presented with absolutely no justification for it[.]

. . . .

You know, when you look at the entire history of everything that's happened with the defendants and the position that they've taken, and if it is true that the defendant corporations have been actively involved in this and yet they - I think that does make it even worse, that it wasn't just the lawyers' delays or whatever the case may be, but it was actually the parties who have adequate resources to make sure all this stuff was done timely, that they just blatantly ignored the Court's order or didn't make any good faith . . . effort to comply and that's what this Court finds, that the defendants made no good faith effort to comply with this Court's order so that there could be meaningful 1442 depositions, and so because of that, all the blatant violations of cooperation and of the Code of Civil Procedure with regard to discovery and the way they've handled - and the violation of the Court's order, it does prejudice the plaintiffs in this case. It's caused a lot of needless waste of time for the plaintiffs to have to file motions and taking depositions that were not meaningful because they didn't have the documents, the defendants had not read the documents, and this is going to be obviously, as acknowledged by the defense counsel . . . a very document intensive case. And for all those reasons, . . . I find that there was no good faith effort on the part of the defendants to satisfy the discovery request in this case and the orders of this Court, and it appears that the defendants just haven't taken any of this very seriously by the amount of time that they have not put into this case or by the very little time that they have put into it and everything that they have ignored.

And so with the Court's finding of all those things, based on everything and the history of this case up until now and the fact that I . . . bent over backwards to give consideration to the defendants in a previous hearing, despite their ignoring of the plaintiff's efforts to try to move forward with discovery, by giving the defendants a continuance and by trying to set some new deadlines to try to move this thing forward, and it does prejudice the plaintiffs in the case in their efforts to move forward in

a timely manner with their case, I find the appropriate remedy in this case is under - and I do find that this has been a violation of Code of Civil Procedure article 1471(a), under 1471(a)(2) I am going to grant the request of the plaintiff and strike the defenses in this case[.]

. . . .

I mean a year has been lost in this case because of the lack of cooperation or nearly that much time because of the lack of cooperation among the defendants. . . .[T]he discovery in this case has not been taken seriously - - it's clear to . . . this Court that the defendants have not taken this seriously at all just by the way we've got witnesses that have kind of just haphazardly been, you know, given information right beforehand and not . . . given time to prepare and made sure that those witnesses had reviewed documents and were aware of what documents were available that would support what they were going to say, and something that you would assume that anybody who was taking the case seriously would've made sure was going to happen[.]

. . . .

And so what I've got here is a case that I have already had to continue and I'm just going to say this one last time. I had to continue this case because of the failure, the intentional and willful failure, of the defendants to cooperate with the plaintiffs which necessitated a court hearing brought about by the defendants because they didn't like being unilaterally brought in for depositions after several months of ignoring the plaintiffs request for mutually agreeable dates and then when I set those deadlines they were not . . . complied with[,] and to the extent that they were complied with[,] they were not meaningful in a few ways. I'm going to say this one more time. The defendants did not meaningfully comply with the Court's order based on the way in which the documents were produced, uncategorized.

. . . .

I think the remedy in this case is drastic and I can say in over seven and a half years on the bench I have never exercised that remedy. I've always erred in favor of just trying to let everybody - you know, just maybe putting things off a little bit, but in light of just the history of the case and the actions of the defendants it seems to this Court that it's the only appropriate remedy that would allow this case to move forward in a timely manner.

The Defendants attempt to characterize their behavior as simply being a "few days later than the court's order required" in producing documents. However, the record reveals that there was a consistent history of the Defendants impeding discovery. The Defendants simply ignored Mr. McWilliams' attempts to take the depositions of the Defendants' corporate representatives for months, and the trial date

7

had to be continued as a result of the Defendants' behavior. While there was no "order to compel" in place on June 30, 2011, when the trial court decided to issue sanctions, the trial court had previously made certain verbal orders pertaining to discovery. At the March 18, 2011 hearing on the Defendants' motion for protective order, the trial court denied the Defendants' motion for protective order and ordered them to comply with discovery, instructing that, by the next scheduled hearing date of March 28, 2011, the parties should set some dates for the taking of depositions of the Defendants' corporate representatives. However, by the time of the March 28, 2011 hearing, no deposition dates had been set. Also at the March 18, 2011 hearing, the trial court ordered the Defendants to produce discovery documents one week prior to any depositions. The trial court determined that the Defendants violated this order as well.

Moreover, the Defendants, rather than providing specific documents in response to Plaintiff's discovery requests, simply provided Plaintiff eighty to ninety boxes of documents and information to go through a few short days before the depositions, none of which were organized in a manner consistent with actually answering Mr. McWilliams' discovery requests. The Defendants claim this was some innocent misunderstanding concerning the form. The trial court felt this document dump was an attempt to "sandbag" Mr. McWilliams. We agree with the trial court. The record also shows that the trial judge had warned Defendants about their uncooperative conduct with regard to discovery on a hearing on March 18, 2011, indicating that if the trial court's orders were not followed, it would not "have any sympathy whatsoever."

Furthermore, once the depositions of the corporate representatives actually began, it became clear that they had not been prepared in any meaningful way, having not brought or even reviewed some of the requested documents. Louisiana Code of Civil Procedure Article 1442, which allows for depositions of corporate

8

representatives, is patterned after Rule 30(b)(6) of the Federal Rules of Civil Procedure. That provision's purpose is to streamline the discovery process by placing the burden of designating and producing competent witnesses upon the party from whom discovery is requested. *See Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275 (3d. Cir. 2000). As long as the deposing party sets out with reasonable particularity the matters on which examination is requested, it is incumbent upon the requested party to produce witnesses able to testify as to matters known or reasonably available to the organization. *Id.*

> When a corporation or association designates a person to testify on its behalf, the corporation appears vicariously through that agent. If that agent is not knowledgeable about relevant facts, and the principal has failed to designate an available, knowledgeable, readily identifiable witness, than the appearance is, for all practical purposes, no appearance at all.

*Id.* at 303 (quoting *Resolution Trust Corp. v. Southern Union Co., Inc.,* 985 F.2d 196, 197 (5th Cir.1993)).

Corporate representatives testified that they had spent as little as two hours preparing for deposition and sometimes learned of the subject matter of their testimony or reviewed materials only the day before they took place. One representative, Kevin Grice, had no notion what Mr. McWilliams' job entailed beyond a general idea. The trial court found that deponent's lack of preparation rendered their appearances pointless and wasted Mr. McWilliams' time. Again, we agree.

Finally, the Defendants participated directly in these delay tactics, as evidenced by their representative agents' lack of diligence in preparing for these depositions. The people the Defendants deemed the most knowledgeable in their fields did little to no work to prepare for their required testimonies. Additionally, the level of the Defendants' participation was admitted by their own counsel, who noted "The client was very involved in this. . . . I can provide affidavits, a witness, whatever, to talk about how involved the client was."

The Defendants squandered every opportunity to proceed in this litigation in a proper manner. They ignored deposition requests for months on end, forcing the trial court to continue this matter from May 2011 to January 2012. Even with that additional time, they failed to make any good faith effort to participate in discovery, despite the fact that Mr. McWilliams has been diagnosed with a potentially terminal illness. The Defendants had been warned that further recalcitrance would incur a severe sanction. The trial court felt that it had discovery orders in place that Defendants blatantly violated. It felt that a lesser penalty would be ineffective and that Mr. McWilliams would be prejudiced by any further delay. Nothing in the record indicates this to be an abuse of the trial court's discretion. Additionally, this exact issue has been before both this court and the Louisiana Supreme Court in the form of a supervisory writ, and no abuse of the trial court's discretion was found by either reviewing court. We can find nothing in the record that indicates that the trial court, this court, or the supreme court were wrong in our earlier determinations. This assignment of error is without merit.

## Evidentiary Claims

The Defendants claim evidentiary errors on the part of the trial court relieved Mr. McWilliams from presenting a prima facie case of causation and liability. They also contend that the trial court erred in not allowing evidence of comparative fault or of Mr. McWilliams' alleged shortened life expectancy.

Regarding the Defendants' claims concerning the establishment of a prima facie case, causation and liability for Mr. McWilliams' leukemia were established based on the sanctions leveled against them. The judgment by the trial court established those as facts for the jury, which was to solely determine what Mr. McWilliams' damages were. The Defendants liken this matter to a default procedure requiring a prima facie case; however, the Defendants did not default, they were simply deprived of the right to litigate the issue of liability due to their bad faith

10

actions. The Defendants were "in no different position than any defendant who admits liability, but disputes damages; who answers the allegations concerning damages, but fails to answer the liability allegations; or who has suffered an adverse summary adjudication of the issue of liability." *Johnson v. Pratt & Whitney Canada, Inc.*, 28 Cal. App. 4th 613, 624, (1994).

Likewise, we can find no error in the trial court's ruling that the Defendants are not entitled to off-sets for settlement amounts paid by other defendants in this suit that settled prior to trial. Again, the discovery sanction establishing liability precluded the Defendants from contesting wrongful conduct and causation. The Defendants' liability was established when their defenses were struck by the trial court. Fault of others was a defense specifically raised by the Defendants in their answer; when it was stricken, comparative fault ceased to be an issue. Simply put, the inquiry into fault was ended. "[The Defendants] forfeited [their] right to lay the blame at someone else's feet. The question remaining for litigation was not, 'Who besides [the Defendants] harmed plaintiffs and to what extent?' Rather, it was, 'What is the amount of plaintiffs' damages?'" *Id.* at 626.

Moreover, even were this court to accept the Defendants' argument as compelling, the voluminous record before this court does not show the amounts of the settlements made by the other original defendants. Of the many proffers the Defendants made, these amounts were not included. This fact may be due to the trial counsel for the Defendants accepting the meaning of the trial court's sanctions ruling. Before this court in their application for supervisory writs, trial counsel conceded that the sanctions precluded the Defendants from "demonstrating the fault of third party actors in this matter." Moreover, counsel noted before the trial court that "[w]e're going to pay whatever judgment the jury gives and *we're the only ones*." (emphasis added). The trial court did not err in precluding the Defendants from offering proof of the liability of others.

However, we do agree with the Defendants that the trial court erred in failing to include evidence as to Mr. McWilliams' shortened life expectancy. "[T]he use of life expectancy tables is disfavored where the plaintiff has a preexisting condition or disease which adversely affects his or her projected life span, since the tables are based on the lives of healthy persons." *Smith v. Miller's Mut. Ins. Co.,* 419 So.2d 59, 63 (La.App. 2 Cir.), *writ denied,* 422 So.2d 155 (La.1982); *Simon v. Smith*, 470 So.2d 941 (La.App. 3 Cir.), *writs denied,* 476 So.2d 353, 355 (La.1985).

The Defendants proffered evidence that due to several health problems other than the leukemia, Mr. McWilliams had an expected lifespan of seven-and-one-half years shorter than an average person. This evidence was unchallenged by Mr. McWilliams and accepted as fact by the trial court. Nevertheless, the trial court, despite several conversations recognizing our decision in *Simon*, failed to allow the Defendants to put that information before the jury in an attempt to stay in line with the sanctions imposed on the Defendants. This was clear error. However, the only award that would have been affected by this error is Mr. McWilliams' future medical expenses. In the interest of judicial efficiency, we are able to reduce this award to the proper amount based on the record before us.

The testimonies of Dr. Rae Langford and Dr. Charles Bettinger established that Mr. McWilliams could expect $6,800.00 in medical expenses a year for the remainder of his life as a result of his leukemia. Based on that amount, the jury awarded Mr. McWilliams $239,972.00 in future medicals using the average life expectancy testified to by Dr. Bettinger. The amount of that award is unchallenged by the Defendants except as to the portion they allege was improperly awarded due to the trial court's legal error. Because, for reasons unrelated to the Defendants' actions, Mr. McWilliams should reasonably expect to live seven-and-one-half years shorter than normal, we hereby simply reduce the award of future medical expenses by $51,000.00 ($6,800 multiplied by seven-and-one-half years) to $188,972.00.

12

**Texas Law**

The Defendants next claim that the trial court erred in failing to apply Texas law to non-maritime issues. They claim that the incorrect application of Louisiana law led to an improper award of prejudgment interest on future damages. The Defendants further claim that the trial court should have applied Texas law to limit the amount of past medical damages recoverable to the amount actually paid by Mr. McWilliams for his medical treatment. Mr. McWilliams counters that the reductions sought by Defendants are defenses that were stricken by the discovery sanction. We disagree with Mr. McWilliams. "An affirmative defense is based on something that has or has not been done related to the cause of action. Here the question pertains to the **law** that governs the cause of action." *Coussan v. Jim Tatman's Mobile Homes, Inc.,* 99-956, p. 5 (La. App. 3 Cir. 12/15/99), 755 So.2d 293, 296.

Mr. McWilliams does not dispute that Texas enjoyed the more significant relationship with the parties and claims. Mr. McWilliams is a Texas domiciliary, was employed in Texas, and all the work performed on Defendants' vessels occurred in Texas. On issues where maritime law does not supersede it, Texas law should apply. Accordingly, as judicial notice may be taken at any stage of the proceeding, this court shall take judicial notice of the laws and statutes of Texas where needed. La.Code Evid. art. 202.

*Prejudgment interest*

> When an action is filed in a state asserting that a cause of action accrued in another state, the applicable state law is determined by whether the issue involved is a matter of substance (right) or a matter of procedure (remedy). The substantive rights of the parties are determined by the law of the state where the cause of action arose; matters of procedure are determined by the law of the forum, i.e., the place where the action is filed. The court of the forum, subject to the limitations of the federal constitution, determines whether the question involved is one of substance or procedure. *Sun Oil Mr. v. Wortman,* 486 U.S. 717, 722, 108 S.Ct. 2117, 2122, 100 L.Ed.2d 743 (1988); *Williams v. Petroleum Helicopters, Inc.,* 234 So.2d 522, 523 (La.App. 3 Cir.1970), *application denied,* 256 La. 371, 236 So.2d 501 (La.1970); *Penny v. Powell,* 162 Tex. 497, 499, 347 S.W.2d 601, 602–03 (Tex.1961); *Hill v. Perel,* 923 S.W.2d

636, 639 (Tex.App.—Houston 1995); H. Goodrich, *supra,* §§ 80–81, pp. 142–44; 16 Am.Jur.2d *Conflict of Laws* § 127, p. 142 (1998). Louisiana law on the conflict of laws applies. La. C.C. art. 3517.

> Substantive laws establish or change substantive rules, rights and duties; procedural laws prescribe a method for enforcing a substantive right and relate to the form of the proceeding or the operation of the laws. *Segura*, 630 So.2d at 723; *Madison*, 825 So.2d at 1254. *See also* H. Goodrich, *supra,* § 80, p. 143, n. 3.

*Wooley v. AmCare Health Plans of Louisiana, Inc.*, 05-2025, p. 17 (La. App. 1 Cir. 10/25/06), 944 So.2d 668, 678. An award of prejudgment interest in state maritime cases is substantive in nature. *Mihalopoulos v. Westwind Africa Line Ltd.,* 511 So.2d 771, (La.App. 5 Cir.1987); *Morris v. Schlumberger, Ltd.,* 436 So.2d 1178 (La.App. 3 Cir.), *writ denied,* 441 So.2d 1221 (La.1983). Moreover,

> Since the statute governing the payment of interest in civil cases in federal courts, 28 U.S.C. § 1961, provides that interest shall be calculated from the date of entry of the judgment, prejudgment interest is generally prohibited in such maritime cases. *Theriot v. J. Ray McDermott & Co.,* 742 F.2d 877, 883 (5th Cir.1984); Douglas, *supra* note 16 (1993). As such, the courts have consistently refused to grant prejudgment interest on awards recovered under the Jones Act.

*Milstead v. Diamond M Offshore, Inc.,* 95-2446, p. 14 (La. 7/2/96), 676 So.2d 89, 97. Additionally, under general maritime law

> [C]ourts have clearly chosen not to grant prejudgment interest on awards for future losses, including future earnings and future pain and suffering. *Boyle v. Pool Offshore Company,* 893 F.2d 713, 719 (5th Cir.1990); *Martin,* 794 F.2d at 212; *Williams,* 750 F.2d at 491. The rationale underlying this rule being that "recovery of interest on losses not yet incurred effectively grants the recipient double recovery." *Martin, supra.*

*Id*.

Texas law is the same in that "Prejudgment interest may not be assessed or recovered on an award of future damages." Tex. Fin. Code Ann. § 304.1045. Thus, it is clear that prejudgment interest is not recoverable for any of Mr. McWilliams' future losses. Accordingly, we reverse the judgment, in part, to eliminate the award of prejudgment interest on any future damages.

As part of those future damages awards, the jury awarded Mr. McWilliams $750,000.00 for "past and future loss of earnings and earning capacity." In order to properly apply our ruling above, we must differentiate what part of that award is apportionable to past loss of earnings from how much is ascribed to future loss of earning capacity. The Defendants do not challenge this award in any way except as pertaining to the application of prejudgment interest, so the total award will remain unchanged.

Dr. Bettinger testified that, based on Mr. McWilliams' earnings for January of 2009, prior to his diagnosis, and the evaluation of his earning capacity performed previously by Dr. Cornelius Gorman, Mr. McWilliams' past lost wages totaled $334,888.00. In accordance with our ruling, Mr. McWilliams is entitled to prejudgment interest on this amount. Subtracting that amount from the total award of $750,000.00 for "past and future loss of earnings and earning capacity" leaves $415,112.00 for loss of future earning capacity. Mr. McWilliams may not recover prejudgment interest on this amount.[1]

*Past Medical Expenses*

Texas Civil Practices and Remedies Code Section 41.0105 provides: "In addition to any other limitation under law, recovery of medical or health care expenses incurred is limited to the amount actually paid or incurred by or on behalf of the claimant." In *Haygood v. De Escabedo*, 356 S.W.3d 390 (Tex. 2011), the Texas Supreme Court read the law to state that amounts billed by a medical care provider, but not paid or anticipated to be paid by the patient, cannot be recovered and cannot be placed in evidence, noting "the common-law collateral source rule does not allow

---

[1] For the sake of thoroughness and in light of our findings on the Defendants' prior arguments concerning life expectancy, we point out that this award would be unchanged by any determination on that issue, as the award is based on work-life expectancy rather than the anticipated length of one's entire life. Furthermore, the unchallenged award as parsed out above only allows Mr. McWilliams a future work life of four to seven years, which would be substantially less than he would be expected to work, even if his work-life expectancy was to be reduced by the seven-and-one-half years discussed previously.

recovery as damages of medical expenses a health care provider is not entitled to charge." *Id.* at 396.

In *Haygood*, the victim was billed over $110,000.00 by several different health care providers, but Medicare contracts required that the bills be reduced to roughly $28,000.00. The Texas court held that the contractually mandated amount was all that the plaintiff was obliged to pay and, therefore, was all he was entitled to recover from the tortfeasor. The plaintiff's argument there that the collateral source rule applied, preventing any reduction, was rebuffed as follows:

> The collateral source rule reflects "the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor." To impose liability for medical expenses that a health care provider is not entitled to charge does not prevent a windfall to a tortfeasor; it creates one for a claimant.

*Id.* at 395 (footnote omitted).

In this case, Mr. McWilliams' total billed medical costs were $458,419.87. The Defendants proffered undisputed evidence that the amount actually paid by Mr. McWilliams was $264,510.35 after adjustments and write-offs by his medical care providers. It is clear that, under Texas law, Mr. McWilliams is only entitled to recover the lesser amount. Consequently, we hereby amend the judgment to reduce the amount of past medical damages to $264,510.35.

## Punitive Damages

The Defendants' next assert two assignments of error concern the award of punitive damages in this case. They claim that the trial court's award of punitive damages deprived the Defendants of due process under the United States Constitution and that the award of $12 million in punitive damages violated federal maritime law by exceeding a 1:1 ratio with the roughly $5.5 million compensatory damage award.

The Defendants assert that the award of punitive damages deprived them of due process under the Fourteenth Amendment to the United States Constitution, claiming:

[t]he trial court's decision on how to present the punitive damage issues to the jury was directly contrary to the Supreme Court's admonition in *Philip Morris USA v. Williams*, 549 U.S. 346, 354 (2007) that "the Due Process Clause prohibits a State from punishing an individual without first providing that individual with 'an opportunity to present every available defense.'" (quoting *Lindsey v. Normet*, 405 U.S. 56, 66 (1972)). Here, the defendants were not given any opportunity, much less every opportunity, to have the jury receive the true, complete facts.

On the contrary, the Defendants did, in fact, have an opportunity to present defenses. However, as noted above, they forfeited their opportunity to present defenses when they incurred the sanctions imposed by the trial court. Due to their own actions, the Defendants' defenses to all aspects of liability were stricken, including liability for punitive damages. The Defendants cite no jurisprudence challenging the inherent constitutionality of La.Code Civ.P. art. 1471 as pertaining to punitive damages, and we can find none. The Defendants were afforded constitutional due process in that they received a hearing to determine what, if any, penalties would result from their continuous and willful violations of the trial court's orders. This assignment of error is without merit.

The Defendants finally claim that the trial court erred in awarding punitive damages in excess of a 1:1 ratio they allege was established by the United States Supreme Court in *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 128 S.Ct. 2605 (2008). The Defendants make an argument similar to the defendant in *Clausen v. Icicle Seafoods, Inc.,* 272 P.3d 827, 834-35 (2012) *cert. denied*, ___U.S.___, 133 S. Ct. 199, (2012)(alterations in original), wherein the Washington Supreme Court provided a thorough review of *Exxon*:

Icicle contends that under federal law, the trial court erred in failing to reduce the judgment by not capping the jury's $1.3 million punitive damage award. Icicle makes no assertion that Clausen was not entitled to punitive damages or that the trial court used the incorrect standard to determine whether punitive damages were excessive. Rather, Icicle argues the trial court was required to reduce the jury's award of punitive damages in accordance with *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008), where the United States Supreme Court reduced a punitive damages award applying a 1:1

ratio to compensatory damages. We disagree with Icicle's reading of the scope of the *Exxon* case.

In the *Exxon* case, the United States Supreme Court's decision involved punitive damages awarded for the *Exxon Valdez* oil spill in Alaska. The jury had awarded $507 million in compensatory damages and $4.5 billion in punitive damages, which, upon remand by the Ninth Circuit, was reduced to $2.5 billion. The United States Supreme Court further limited the punitive damages award, capping punitive damages at a 1:1 ratio to compensatory damages. In its decision, the Court discusses the history, development, and justifications underlying the creation of the punitive damages remedy. The Court recognized that a punitive damages remedy advances the goals of punishing egregious and willful behavior resulting in injury and punishing conduct designed and intended to provide some financial gain to the offending party, as well as deterring similar conduct. The Court also recognized that punitive damages awards failing to advance these goals not only would be carefully scrutinized, but could be subject to constitutional due process concerns. In essence, the Court established that, under general maritime law, punishment for conduct minimally related to the goals of punishment could be limited and subject to a 1:1 ratio with compensatory damages, which in the *Exxon* case were substantial. Important to the analysis here, throughout the *Exxon* case, the Court emphasized it was faced with facts establishing that Exxon's conduct was not at the extreme end of the scale of egregiousness, no profit motive was expressly involved, and there was already a substantial recovery for damages. *Exxon,* 554 U.S. at 510–13, 128 S.Ct. 2605.

We find nothing in the *Exxon* case establishing a general rule limiting the jury's role in determining appropriate damages. The *Exxon* case cannot be read as establishing a broad, general rule limiting punitive damage awards, primarily because nowhere in the opinion can such a rule be found. To the contrary, the United States Supreme Court expressly limits its holding to the facts presented. In the first paragraph of the opinion, the issue is framed as "whether the award ... *in this case* is greater than maritime law should allow *in the circumstances." Exxon,* 554 U.S. at 476, 128 S.Ct. 2605 (emphasis added).

Toward the end of its analysis, the Court again, in the context of analyzing the spectrum of laws and cases establishing limits on punitive awards, observes ". . . the upper limit is not directed to cases *like this one,* where the tortious action was worse than negligent but less than malicious, . . . the 3:1 ratio . . . applies to awards in *quite different* cases involving . . . malicious behavior and dangerous activity carried on for the purpose of increasing a tortfeasor's financial gain. We confront, instead, *a case* of reckless action, profitless to the tortfeasor." *Exxon,* 554 U.S. at 510–11, 128 S.Ct. 2605 (footnotes omitted). Continuing in that same paragraph, during its discussion of limits established legislatively, the Court states, "[t]hus, a legislative judgment that 3:1 is a reasonable limit overall is not a judgment that 3:1 is a reasonable limit *in this particular type of case." Exxon,* 554 U.S. at 510–11, 128 S.Ct. 2605 (emphasis added). Nothing in the *Exxon* opinion can be read as overruling cases allowing higher punitive awards or limiting the

government's ability to statutorily provide other limits. Quite the opposite, the Court seems to embrace an approach of applying a variable limit based on the tortfeasor's culpability. *Exxon,* 554 U.S. at 510 n. 24, 128 S.Ct. 2605.

We agree with the Washington Supreme Court's analysis of *Exxon*. Therein, the United States Supreme Court did not establish a general rule pertaining to punitive damages, but rather, narrowly tailored that result to the unique case before it. Most notably, the United States Supreme Court must also agree with the *Clausen* court's analysis, as it denied certiorari in that case. The Defendants' assertion that any punitive damage award must adhere to a 1:1 compensatory to punitive damages ratio is devoid of merit. As the Defendants do not challenge the amount of the award other than as related to the compensatory damage award, we can find no error in the jury's award.

## Conclusion

For the above reasons, the judgment of the trial court is hereby affirmed in part, as amended, and reversed in part. The judgment sanctioning Defendants for willful violations of discovery orders is affirmed. The trial court's determination regarding off-sets is affirmed. The amount of future medical damages is amended to decrease the award from $239,972.00 to $188,972.00. The award of "past and future loss of earnings and earning capacity" is amended to clarify that the award is split $334,888.00 for past lost wages and $415,112.00 for future loss of earning capacity. The judgment denying the application of Texas law on this matter is reversed. Mr. McWilliams is, therefore, not entitled to prejudgment interest on any future damages, including the amounts decreased or severed above. The award of past medical damages is also amended to reduce the award from $458,419.87 to $264,510.35. The trial court's determinations as to punitive damages are affirmed. Costs of this appeal are to be split by the parties.

**AFFIRMED IN PART AS AMENDED; AND REVERSED IN PART.**